# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 27, 2009 Session

## STATE OF TENNESSEE v. TRACY LYNN COPE

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S51,219     Robert H. Montgomery, Jr., Judge**

---

**No. E2009-00435-CCA-R3-CD - Filed May 20, 2010**

---

The defendant, Tracy Lynn Cope, was convicted of one count of especially aggravated kidnapping, a Class A felony; one count of aggravated kidnapping, a Class B felony; and one count of false imprisonment, a Class A misdemeanor. He was sentenced as a Range II, multiple offender to forty years for the Class A felony, twenty years for the Class B felony, and eleven months and twenty-nine days for the Class A misdemeanor. The sentences were ordered to run concurrently for a total effective sentence of forty years. On appeal, he argues that: the evidence was insufficient to support his convictions; the trial court erred in allowing the victim to testify that the defendant broke his hand by hitting her in the face; trial counsel was ineffective; and he was improperly sentenced. After careful review, we affirm the judgments from the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Jerry J. Fabus, Jr., Gray, Tennessee, for the appellant, Tracy Lynn Cope.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Barry P. Staubus, Deputy District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant in this case was convicted of kidnapping Amanda Wilson and Debbie Callahan. The victim, who was the defendant's girlfriend, arrived home to find him engaged in sexual relations with a third woman, Jakia Ford. The victim told the defendant to gather

his things and leave.  She recalled that the defendant became angry and started to scream and yell.  She testified that he had been smoking cocaine and had not slept in three days.  He repeatedly said that there was someone in the apartment and that the women were trying to kill him.  She said he picked up the box springs and opened the closet doors.  She said that both women attempted to leave the apartment, but the defendant would not allow them to leave.  He said he was going to "get" them before they got him.

The defendant forced both women into Wilson's van.  He held Ms. Ford by the waist and Wilson by her shirt.  Wilson said they did not resist or try to run away because she knew what the defendant could do.  She testified that she was afraid because she knew she could not run away from the defendant.  Once inside the van, the defendant locked the doors and drove through downtown Kingsport.  Wilson testified that the defendant did not speak to the women, but he talked to himself.  He said, "Damn, Tracy, look[] what you've done.  You just need to take them out to the country and tie them up to a tree."  He drove them to a public housing apartment complex in Kingsport where he forced them into an apartment.  He told the man in the apartment that he had "taken" the women and that they needed to "pay the price" for trying to kill him.  The defendant then forced the women back out to the van.  Although the defendant stopped the van later and allowed Ms. Ford to leave, the victim testified that Ms. Ford appeared to be afraid the entire time.

The defendant then drove to another apartment complex and forced Wilson out of the van.  He knocked on a door where Debbie Callahan, the second victim, answered.  The defendant grabbed both women and made them sit on the floor.  He accused them of trying to kill him.  Wilson thought he was even angrier and more agitated than when she first saw him in their apartment earlier that evening.

The defendant forced Wilson to remove her clothes, and he was holding both women until Wilson tried to resist.  At that point, Ms. Callahan was able to escape and ran out the front door.  The police were called during the struggle, and Wilson could see a uniformed officer and his car outside the apartment door.  The defendant screamed that the officer was not really the police.  The defendant put Wilson in a choke hold from behind.  He eventually walked out of the apartment but continued to hold Wilson by her throat.  The defendant held her between him and the officer.  He eventually let go of Wilson and lay on the ground as instructed by the officers.

Ms. Callahan, the second victim, testified that she lived in an apartment in Sullivan County and that she had met the defendant one day when they smoked crack in her apartment.  She recalled that the defendant knocked on her door in the early morning hours of August 29, 2005.  The defendant asked her if she wanted to buy some crack, but she told him she had no money.  He asked to come in anyway, and they started to smoke some crack.

She recalled that the defendant began to act strangely and became rough and mean toward her. He began grabbing at her in an attempt to have sex with her. She said he also wanted her to have sex with his girlfriend who was in the car.

Callahan went to the door and screamed for Wilson to come inside because the defendant was getting out of control. The defendant removed Wilson's clothes and also attempted to remove Callahan's clothes. She said that he grabbed her by her hair, shirt, and pants, but she did not want him to touch her. He told her that, if she tried to set him up, he would fix her so nobody would ever look at her again. She testified that she was afraid then and was still afraid at trial. She said that when she freed herself, she ran from the apartment and hid under a tree for a couple of hours.

Officer Jason McClain testified that he was a patrolman with the Kingsport Police Department when he was dispatched to Callahan's apartment. He arrived around 4:45 a.m. to find the defendant and Callahan inside the apartment. The door was open, and he heard a man's voice yelling, "Call 911, call 911, I want police here now, call 911." He looked inside and saw the defendant screaming as he held Callahan in a choke hold. She was crying, shaking, and appeared to be very frightened. The officer identified himself as the police and asked, "What's going on here, I am the police."

The officer testified that he could see something on or in the defendant's hand, which he was holding behind Callahan. It turned out to be a cast on the defendant's hand but, at the time, the officer was unable to determine if it was a weapon. The officer testified that he took cover behind the doorframe, called for backup, and waited for additional officers. The defendant continued to hold Callahan in a choke hold. When backup officers arrived, they ordered the defendant to come out of the apartment. The defendant still had Callahan in a choke hold when he came outside and held her body between himself and the officers. He released her when the officers ordered him to the ground.

The officer testified that four to five minutes elapsed between his arrival until the defendant was on the ground outside the apartment. He estimated that the defendant held Callahan "just a minute" at the door to the apartment. The officer did not have his weapon drawn when he first saw the defendant through the apartment door, but his weapon was drawn when the defendant exited the apartment.

During the hearing on the motion for new trial, Jakia Ford testified that she was the woman with the defendant when Wilson arrived home from work. She said that she was willing to testify at trial that the defendant did not force her or Wilson into the vehicle. She said that she spoke with the defendant's trial counsel and repeated her willingness to testify

on the defendant's behalf. She testified that she gave counsel her telephone number but was not contacted prior to trial.

The defendant testified that he spoke with trial counsel twice before trial. He said that trial counsel did not advise him that he could get a forty-year sentence at trial. He chose not to testify because he was told by someone that his entire criminal history could be used against him if he testified. He said that his entire record had been put into evidence during a bond reinstatement hearing and that he was "under the assumption" it could be used at trial. He did not discuss this assumption with trial counsel. He said that trial counsel told him that he had been unable to locate Ms. Ford before trial.

The defendant's trial counsel testified that, at the time of the hearing, he had been a public defender for more than eighteen years and also had experience in private practice. He said that the State made an offer for an effective sentence of twelve years at one-hundred percent. He said that he met with the defendant "quite a bit more than two" times before trial. He discussed sentencing with the defendant, including the possibility of consecutive sentences. He also discussed the possibility of a portion of the defendant's prior record being used at trial to impeach him if he decided to testify. He did not recall telling the defendant that his entire record could be used. He recalled that the defendant brought Ms. Ford to his office, and he told trial counsel that she would testify. The defendant told him he would keep her "happy" until she testified. Counsel said that he did not have a telephone number for Ms. Ford but attempted to locate her for trial. Ms. Ford's grandmother told him that she did not know where Ms. Ford was. He also tried to locate her through her probation officer but was told that Ms. Ford was not reporting.

Following the hearing, the trial court issued a written order denying the motion for new trial. This appeal followed.

Analysis

The defendant argues that the evidence was insufficient to support his convictions for especially aggravated kidnapping and aggravated kidnapping. When an accused challenges the sufficiency of the evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Brewer*, 932 S.W.2d 1, 18 (Tenn. Crim. App. 1996).

In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this

-4-

court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. *Liakas v. State*, 286 S.W.2d 856, 859 (1956). To the contrary, this court is required to afford the State the strongest legitimate view of the evidence contained in the record, as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003).

The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence. *Id.* In *State v. Grace*, the Tennessee Supreme Court stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." 493 S.W.2d 474, 476 (Tenn. 1973). Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *Grace*, 493 S.W.2d at 476.

First, the defendant argues that "the jury wrongly applied the shield element" of especially aggravated kidnapping because the evidence did not show that he was using the victim to shield himself from imminent death or serious injury. Specifically, he argues that he was not shielded from anything because the officer's weapons were not trained on him. Especially aggravated kidnapping is defined as false imprisonment or "knowingly remov[ing] or confin[ing] another unlawfully so as to interfere substantially with the other's liberty," committed to hold the victim as a shield or hostage. T.C.A. § 39-13-305(a)(3) (2006). The defendant emerged from the apartment clutching Callahan in a choke hold, positioning her between himself and the responding officers. The first officer at the scene testified that he had his weapon drawn when the defendant exited the apartment and thought the defendant was armed due to the cast on his hand. The evidence at trial is consistent with a finding that the defendant held Callahan between himself and the officers until he surrendered. From the evidence presented, a reasonable jury could conclude that the defendant used the victim to shield himself from the officers. The evidence is sufficient to support this conviction for especially aggravated kidnapping.

Next, the defendant argues that the evidence is insufficient to support his conviction for the aggravated kidnapping of the second victim, Ms. Callahan. Specifically, he contends that the evidence did not sufficiently demonstrate that he substantially interfered with the second victim's liberty or that she suffered bodily injury. Aggravated kidnapping, as applicable here, is defined as "knowingly remov[ing] or confin[ing] another unlawfully so as to interfere substantially with the other's liberty" and "with the intent to inflict serious bodily injury on or to terrorize the victim or another" or where the victim "suffers bodily injury." T.C.A. § 39-13-302(a), -304 (2006).

The evidence at trial demonstrated that the defendant grabbed Callahan by her hair, shirt, and pants. She testified that she was afraid of the defendant, who confined her against her will and that he hurt her. The defendant attempted to remove her clothes and force her to engage in sex with him and with the other victim. Finally, he threatened to kill her and to make it so "nobody will ever look at [her] again." The record reflects that the defendant terrorized Callahan, which was sufficient to satisfy the definition of aggravated kidnapping under the statute.

Next, the defendant argues that the trial court erred in denying his motion to exclude testimony that he broke his hand when he hit Wilson in the face a few weeks prior to the underlying incidents. Tennessee Rule of Evidence 404(b) provides for the admission of evidence of other crimes, wrongs, or acts as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1)   The court upon request must hold a hearing outside the jury's presence;
>
> (2)   The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3)   The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4)   The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

When the trial judge has substantially complied with procedural requirements, the standard of review is abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

Here, the trial court held a jury-out hearing to determine the admissibility of the victim's statement that the defendant had previously broken his hand when he hit her in the face. The court then determined that the evidence was relevant and necessary to the facts of the offense and that it was not unfairly prejudicial to the defendant. The victim testified that she could not leave because she was afraid and felt threatened during the kidnapping. She testified that she offered little resistance to the defendant because of the previous violence

between herself and the defendant. The trial court determined that the jury needed to hear about the victim's state of mind, that she was afraid of the defendant, because it provided context for why the victim offered little resistance during the kidnapping.

The record reflects that the trial court followed the appropriate statutory procedure before determining that the prior violent act was relevant and was more probative than prejudicial. The State sought to introduce the evidence during the victim's testimony to demonstrate why she was submissive during the incident. Any error in admitting the evidence would amount to harmless error because of the evidence of the defendant's guilt. The defendant is not entitled to relief on this issue.

Next, the defendant argues that he received ineffective assistance of counsel at trial when counsel did not subpoena the third victim to trial or properly explain which of the defendant's prior convictions might be used to impeach him if he elected to testify. In order to prove ineffective assistance of counsel, the petitioner must prove that (1) counsel's performance was deficient, and (2) the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings were fundamentally unfair. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court established that the services rendered should be within the range of competence demanded of attorneys in criminal cases.

Trial counsel testified that he spoke generally with the petitioner about which of his prior convictions could be used to impeach him at trial if he chose to testify. He did not recall discussing whether the defendant's prior misdemeanors or his 1991 felony theft conviction could be used to impeach him. The defendant testified that he did not testify because someone told him that his entire criminal history could be used against him if he testified. He said his criminal history had been put into evidence during a bond hearing, and he assumed that it could all be used against him at trial if he testified. He did not discuss his assumption with counsel, but it was his primary factor in deciding not to testify. If the petitioner had decided to testify, both his attempted first degree murder and theft convictions would have been available for impeachment purposes. He has simply argued that he was given bad advice from a third party. Counsel testified that he and the petitioner discussed the prior convictions that could be used to impeach him at trial. The petitioner has not demonstrated that trial counsel was deficient.

With regard to counsel's failure to produce the attendance of Ms. Ford at trial, counsel testified that he attempted to locate and subpoena her. He said that he personally went to her supposed residence. He said that he spoke with her grandmother, but she did not have any information for where to find Ms. Ford. Counsel tried to locate the witness through her probation officer but discovered that she was not reporting at the time and that the officer

did not know where to locate her. Trial counsel's efforts were reasonable under the circumstances, and the defendant has failed to show any deficiency in counsel's actions.

Next, the defendant argues that he was improperly sentenced to the maximum sentence in the range for each of his three convictions. The defendant was sentenced to forty years for especially aggravated kidnapping, twenty years for aggravated kidnapping, and eleven months and twenty-nine days for false imprisonment. The Tennessee Supreme Court has held that the burden of demonstrating that a sentence is erroneous is upon the appealing party. *State v. Carter,* 254 S.W.3d 335, 344 (Tenn. 2008). This court's review is *de novo* with a presumption that the trial court's determinations are correct. *Id.* This presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *Id.* at 344-45 (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)).

The trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of the Sentencing Act." *Id.* at 343 (quoting T.C.A. § 40-35-210(d) (2006)). In sentencing a defendant, the trial court is required to consider the following:

(1)     The evidence, if any, received at the trial and the sentencing hearing;

(2)     The presentence report;

(3)     The principles of sentencing and arguments as to sentencing alternatives;

(4)     The nature and characteristics of the criminal conduct involved;

(5)     Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6)     Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7)     Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

*Id*. § 40-35-210(b). The trial court's weighing of the various mitigating and enhancement factors has been left to the trial court's sound discretion. *Carter*, 254 S.W.3d at 345. "Since the Sentencing Act has been revised to render these factors merely advisory, that discretion

has been broadened." *Id.* If the trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors. Therefore, the appellate courts are left with a more narrow set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence. *Id.* at 345-46.

Here, the trial court considered multiple enhancement factors at sentencing, declined to find any mitigating factors, and sentenced the defendant to the maximum within the applicable range for each conviction. The court found that the defendant has a criminal history in addition to that necessary to establish his range. *See* T.C.A. § 40-35-114(1) (2006). The defendant's presentence report reflects convictions for attempted first degree murder, criminal impersonation, disorderly conduct, obstruction of justice, public intoxication, forgery, evading arrest, marijuana possession, jumping bail, and multiple convictions each for driving with a suspended license, assault, cocaine possession, worthless checks, and possession of drug paraphernalia. The trial court also noted that the defendant admitted to using substantial amounts of illegal drugs.

The trial court also found that the defendant has previously failed to comply with the conditions of several sentences involving release into the community. *See* T.C.A. § 40-35-114(8). The defendant's presentence report reflects that his probation was revoked twice on his 1990 forgery conviction and once on his 1993 attempted first degree murder conviction.

The trial court also considered the sentencing enhancement for showing no hesitation to commit the offense when the risk to life was high. *See* T.C.A. § 40-35-114(10). The court applied this enhancement factor based on the jury's determination that the defendant used one of the victims as a shield to protect him from the police officers. The trial court also noted that the defendant's actions regarding the victims supported the consideration of this enhancement factor based on the defendant's violent behavior toward the second victim.

Pursuant to Tennessee Code Annotated section 40-35-114(3), the trial court also considered that more than one victim was involved. The State notes that this factor was improperly applied because multiple victims do not support consideration of this enhancement factor where the victims of each indicted offense are specifically named or described. *See State v. Imfeld*, 70 S.W.3d 698 (Tenn. 2002). There were three victims in this case, and the defendant was indicted and convicted for crimes involving his conduct specifically regarding each of the victims. The defendant does not contest the application of this factor even though it was wrongly applied by the trial court. Because the trial court

wrongfully applied this factor, it may not be considered in enhancing the defendant's sentence despite the fact that he did not contest its application.

The defendant also argues that the trial court erred by failing to consider his voluntary release of the victims as a mitigating factor. Tennessee Code Annotated section 39-13-305(b)(2) requires that the voluntary release of a victim be considered in mitigation of a sentence for especially aggravated kidnapping. However, the record fails to show that the appellant voluntarily released either victim. The second victim testified that she escaped by running out the front door and hiding. This court has previously determined that this mitigating factor does not apply when the victim escaped. *State v. Taylor*, 63 S.W.3d 400, 412 (Tenn. Crim. App. 2001). The defendant only released the first victim under the threat of force by police officers. The record does not reflect that her release was voluntary. Therefore, the trial court has not abused its discretion for failing to consider this factor.

The defendant acknowledged that he is a Range II offender and that the trial court properly applied enhancement factors one and eight. Here, the defendant argues that the trial court improperly applied the enhancement factor for having no hesitation to commit the crime when the risk to human life was high. The defendant argues that this factor is only applicable when a high risk to human life is established by facts separate from those necessary to establish an element of the offense. The trial court applied this factor to both victims.

The defendant used the first victim as a shield when the police arrived on the scene. We conclude the trial court properly applied this enhancement factor as to the first victim.

The defendant argues that the record is void of "any actual high risk" to the second victim's life. The second victim's testimony reflects that the defendant grabbed at and threatened her and that she escaped from the apartment before the police arrived. The defendant argues that simply grabbing and threatening do not give rise to application of the enhancement factor. We agree. However, because the application of the factors is merely advisory and it is within the trial court's discretion to consider which factors to consider in establishing the defendant's sentence, we shall not modify the defendant's sentence based on this conclusion. The trial court's weighing of the various mitigating and enhancement factors is left to the trial court's sound discretion. *Carter*, 254 S.W.3d at 345. The sentencing range for the defendant is twenty-five to forty years. Only two of the four factors applied by the trial court are applicable. However, because the defendant's criminal history is extensive, the trial court did not err in concluding that long-term restraint was necessary. Therefore, we affirm the sentence from the trial court.

Conclusion

-10-

Based on the foregoing and the record as a whole, we affirm the judgments from the trial court.

_____

JOHN EVERETT WILLIAMS, JUDGE